**Exhibit 6**

**Declaration of Nandan M. Joshi in Support of Plaintiff's Motion for Summary Judgment**

**Gill v. U.S. Department of Justice *et al*.**

**Case No. 3:26-cv-03283-CAB-DDL**

# Senator Thom Tillis
# Questions for the Record
# Senate Judiciary Committee Hearing
# for the Nomination of the Honorable
# Todd Blanche to be Attorney General of the United States

At CPAC in March 2026, you cheered on the President regarding the pardons granted to January 6 defendants, some of whom were convicted of assaulting federal officers.

1. Do you believe individuals who assaulted law enforcement officers on January 6 committed serious crimes?

   **RESPONSE:** An assault on a federal law enforcement officer is a serious crime and a violation of federal law. Under my leadership, the Department of Justice will prosecute those who assault federal law enforcement officers.

2. Do you believe that these individuals who were convicted of assaulting law enforcement are victims of government weaponization?

   **RESPONSE:** As I testified at my confirmation hearing, any person who assaults law enforcement should be prosecuted to the fullest extent of the law.

3. If confirmed, how would you ensure that future political violence is investigated and prosecuted without regard to political ideology?

   **RESPONSE:** There is no acceptable level of political violence that can be tolerated. For this reason, we have created Operation Vanguard which targets and prosecutes any criminal conduct that seeks to intimidate or suppress political speech or activity regardless of its affiliation.

4. In establishing the so-called "Anti-Weaponization Fund," you sought approval from the Treasury Department's Judgment Fund to transfer $1.776 Billion to that fund, correct?

**RESPONSE:** The document speaks for itself. It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

5. In making the request of the Treasury from the Judgment Fund in connection with President Trump's Privacy Act lawsuit in order to fund the "*Anti-Weaponization Fund* (AWF or Fund)" did DOJ have to justify the amount it requested?

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

   a. What justification did DOJ provide?

      **RESPONSE:** The amount was a term of the negotiated settlement, and the settlement's terms are set out in the agreement, which is public. As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

   b. Was the justification provided in writing? Please provide us with copies.

      **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

   c. Who at DOJ was involved in preparing the justification?

      **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

d. Did anyone at DOJ meet with anyone at the Treasury regarding the request for $1.776 Billion from the Judgment Fund? Who was involved in those discussions?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

6. How did DOJ derive the $1.776 Billion amount it requested from the Judgment Fund?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

a. Aren't requests for funds from the Judgment Fund to settle lawsuits supposed to be supported by an assessment of litigation risk from the underlying lawsuit?

**RESPONSE:** It has long been the opinion of the Office of Legal Counsel that the Attorney General has broad authority to compromise and/or settle claims on behalf of the United States. Accordingly, all such claims are settled in the best interest of the United States.

b. Was the request and determination from the Treasury's Judgment Fund for $1.776 Billion based on an assessment of litigation risk? Is it documented? If so, please provide copies.

**RESPONSE:** It has long been the opinion of the Office of Legal Counsel that the Attorney General has broad authority to compromise and/or settle claims on behalf of the United States. Accordingly, all such claims are settled in the best interest of the United States.

c. What was the litigation risk if President Trump's lawsuit had proceeded?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. In any

case there is litigation risk and it has long been the opinion of the Office of Legal Counsel that the Attorney General has broad authority to compromise and/or settle claims on behalf of the United States. Accordingly, all such claims are settled in the best interest of the United States.

d. What assumptions went into making such a litigation risk assessment?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

e. If President Trump, his family, and the Trump Organization had gone forward with their Privacy Act case and you had not settled the lawsuit, what was the risk that individuals other than the President, his family, and the Trump Organization would have been able to recover damages?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. In any case there was litigation risk, and it has long been the opinion of the Office of Legal Counsel that the Attorney General has broad authority to compromise and/or settle claims on behalf of the United States. Accordingly, all such claims would have been settled in the best interest of the United States. As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

f. Do you agree that only plaintiffs to that lawsuit would have been eligible to recover damages?

**RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. In any case there was litigation risk, and it has long been the opinion of the Office of Legal Counsel that the Attorney General has broad authority to compromise and/or settle claims on behalf of the United States.

Accordingly, all such claims would have been settled in the best interest of the United States. As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

7. Did DOJ ever assess the risk that a class action could successfully have been maintained as part of President Trump's lawsuit?

   **RESPONSE:** The document speaks for itself. It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

   a. How did DOJ assess that risk? Is that documented? If so, please provide copies.

      **RESPONSE:** The document speaks for itself. It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

   b. How many class members did DOJ estimate would be part of a successful class action?

      **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

   c. How did DOJ define the class for purposes of thinking about the $1.776 Billion amount it requested of Treasury from the Judgment Fund?

      **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

8. Did DOJ make any assumptions about who would make claims for money from the Anti Weaponization Fund when it asked Treasury for the $1.776 Billion?

**RESPONSE:** As I testified at my confirmation hearing, anyone with a claim against the United States for weaponization – except the President or his family – could have pursued relief from the Anti-Weaponization Fund.

a. Did those assumptions include making payments to people who harmed police officers?

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. That said, as I testified at my confirmation hearing, anyone who assaults law enforcement should be prosecuted to the fullest extent of the law.

b. Did those assumptions include making payments to people who destroyed property on Capitol Hill?

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice. That said, anyone who destroys property on Capitol Hill should be prosecuted to the fullest extent of the law.

c. If DOJ did not make assumptions about who would make successful claims for payment from the Anti-Weaponization Fund, how was DOJ able to derive the $1.776 Billion it requested for the Fund?

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not, have occurred in conjunction with any official act by the Department of Justice. Both the May 18, 2026 Settlement Agreement and May 18, 2026 Memorandum specify that: "The corpus of the Anti-Weaponization Fund's funding does not represent the value of any claim by Plaintiffs, but rather is based on the projected valuation of future claimants' claims."

d. Is any of this documented? Please provide copies.

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in

conjunction with any official act by the Department of Justice. Both the May 18, 2026 Settlement Agreement and May 18, 2026 Memorandum specify that: "The corpus of the Anti-Weaponization Fund's funding does not represent the value of any claim by Plaintiffs, but rather is based on the projected valuation of future claimants' claims."

9. Your Principal Associate Deputy, Trent McCotter, created the Anti-Weaponization Fund, correct?

   **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

   a. What attorneys at DOJ were involved in creation of the Anti-Weaponization

      **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

10. DOJ sought to dismiss the case challenging the Anti-Weaponization Fund arguing it was moot, and a federal judge ordered you to attest in writing that the Fund was no longer going to be used, correct?

    **Response:** That is incorrect. As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

    a. Did you have a role in drafting or approving of the filing DOJ made to the court in that case? Who did?

       **RESPONSE:** It would be inappropriate for me to comment on internal deliberations that may or may not have occurred in conjunction with any official act by the Department of Justice.

11. You have testified before Congress that you will NOT move forward with the Anti-Weaponization Fund, and at the same time the President has

consistently supported the Fund. If the President directs you to reverse your decision and move forward with the Fund, will you move forward?

**RESPONSE:** It would be inappropriate for me to comment on hypothetical communications I may or may not have with the President. That said, as I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

a. And if you do move forward with the Fund after having testified to Congress that the Fund will "not go forward, period," will you be subject to a charge of perjury for your testimony to Congress?

   **RESPONSE:** As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

12. Has any January 6th defendant, or their counsel, applied for or inquired about payment from the Anti-Weaponization Fund? Please provide copies of those records.

**RESPONSE:** As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred, no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

13. Will you commit that under your leadership, DOJ will not give any payouts from taxpayer money in the Judgment Fund or from the Anti-Weaponization Fund to any rioters who assaulted law enforcement officers or damaged property on Capitol Hill on January 6th?

**RESPONSE:** An assault on a federal law enforcement officer is a serious crime and a violation of federal law. Every claim submitted pursuant to the Federal Tort Claims Act is reviewed on the merits and addressed by the Torts Branch of the Civil Division. Any decision by the Department to resolve or settle any claim is made only in the best interest of the United States.

14. You've publicly stated that the Anti-Weaponization Fund has been abandoned by the administration. What assurances do you offer both the American people and us that it won't return later?

    **RESPONSE:** As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

    a. Can you reaffirm your statement, in writing, that the Anti-Weaponization Fund is "moot"?

       **RESPONSE:** As I testified at my confirmation hearing, and as the Department has repeatedly represented in Court, no commissioners have been appointed; no funds have been transferred; no claims have been received; and no claims have been paid. The Anti-Weaponization Fund is dead.

15. Will you commit to working with my office and other Senate offices in good faith to develop legislative language that would eliminate the Anti-Weaponization Fund?

    **RESPONSE:** Yes.

***<u>Louisiana v. FDA</u>***

The State of Louisiana and individual plaintiff Rosalie Markezich are suing the FDA to challenge the 2023 regulatory "REMS" change that allowed for mail order prescriptions of the chemical abortion drug, mifepristone. On January 27, 2026, the U.S. Department of Justice (DOJ) filed to stay the case.

1. Why is the DOJ defending the Biden-era policy yet has overturned countless other policies, memos, regulations, and executive orders from Biden. Why has that not happened here?

   **RESPONSE:** As I stated at my confirmation hearing, it would be inappropriate for me to discuss specific litigation strategy or to comment on pending matters beyond what is set forth in the Department's public filings. The Food and Drug Administration (FDA) is currently reviewing the safety