Stanley E. Woodward, Jr.
ASSOCIATE ATTORNEY GENERAL

Andrew J. Block
Senior Counsel, Office of the Associate Attorney General
Henrique Carneiro
*Counsel to the Associate Attorney General*
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Tel: (202) 514-0136
andrew.block@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALLISON M. GILL,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Case No.: 26-cv-3283-CAB-DDL<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>Date: FRIDAY, SEPTEMBER 4, 2026<br><br>Time: PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT<br><br>Judge: THE HONORABLE CATHY ANN BENCIVENGO |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

**INTRODUCTION**

If it was not before, this case is now, without a shadow of a doubt, moot. The Government's representations that the Fund will not move forward have already caused one federal district court's denial of preliminary relief on mootness and ripeness grounds in a similar case challenging the Fund. And the Government has thoroughly addressed any remaining concerns through the Attorney General's sworn testimony before the Senate Judiciary Committee and his subsequent written rescission of the May 18 Order. There is no likelihood that the challenged conduct—the establishment of the Fund under regulations Plaintiff disagrees with—will occur let alone recur.

In addition, this week's Supreme Court decision in *Trump v. California* confirms that Plaintiff never had standing because the challenged agency actions caused no concrete harm to anyone, and that, for the same reasons, this case was never ripe under Article III. Nor is Plaintiff saved by any relaxed standard of Article III standing in procedural-injury cases. The declaratory judgment she now seeks would amount only to an advisory opinion. And because the "psychic satisfaction" of a favorable outcome "is not an acceptable Article III remedy because it does not redress a cognizable Article III injury" Plaintiff does not have standing. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998). Under all relevant doctrines, this case is not justiciable.

Even if it were, Plaintiff fails to adequately allege a cause of action under the APA. There is no final agency action, and notice-and-comment would not have been required in any event. The challenged action does not amount to a legislative rule because the Fund would not have created any binding obligations on anyone—it would have been a purely voluntary program, and it would not have affected anyone's right to press any claim in a judicial forum. Also, the Fund would have operated solely through downstream, discretionary decisions of Commissioners who were never appointed.

For those reasons, the Court should grant Defendants' Motion to Dismiss.

## I. THE CASE IS MOOT.

Because there is not going to be a Fund, Plaintiff has received all the relief she requested and the case is moot..

Plaintiff's own arguments confirm as much. She states that the agency action she challenges is the sum of (1) the Attorney General's May 18 Order and (2) a Department of Justice press release summarizing provisions relating to the Fund in the *Trump v. IRS* Settlement Agreement. Opp. 4. But she concedes that this purported "agency action" no longer exists, acknowledging that the Attorney General signed a superseding Order rescinding the May 18 Order, rendering it of "no force or effect," and "establish[ing], beyond any reasonable doubt, that there is no Fund." Dkt. 14-8, Rescission Order; *see also* Opp. 6, 14, 15. But in an attempt to avoid the case-ending consequences of this concession, Plaintiff speculates that Defendants' representations, including the Rescission Order, "fall[] short of demonstrating that [they] cannot reasonably be expected to do again in the future what [they are] alleged to have done in the past." Opp. 16 (quoting *FBI v. Fikre*, 601 U.S. 234, 242 (2024)).

First, nothing ever *occurred*, so nothing can be expected to "*recur*." Plaintiff's contention further fails under basic mootness principles articulated by the Ninth Circuit. Addressing policy changes, of the sort at issue here, courts are "more likely" to find mootness where officials "have not engaged in conduct similar to that challenged by plaintiff"; where "the policy change is evidenced by language that is 'broad in scope and unequivocal in tone'"; where it "fully addresses all of the objectionable measures." *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (quoting *White v. Lee*, 227 F.3d 1214, 1222–24 (9th Cir. 2000)). As explained below, each of these factors weigh heavily in favor of finding mootness here.

The Government's representations have been consistent, have all pointed in the same direction, and have been made under the threat of serious penalties and sanctions for falsity. *See Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (explaining that there is a "long-standing presumption of regularity" whereby courts presume officers

"properly discharge their official duties"); *Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy."). In light of this overwhelming consistency, Plaintiff's attempt to characterize the Government's representations that the Fund will not go forward as false rings hollow. Opp. 14.

In June, one court found that claims regarding the fund were "likely moot." *CREW v. DOJ*, 2026 WL 1802997, at *1 (D.D.C. June 23, 2026). The Attorney General subsequently testified under oath that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States at 1:26:42–49. He said the same thing in written answers to Senators' Questions for the Record in connection with his Senate confirmation. *See, e.g.*, Questions for the Record, The Nomination of the Honorable Todd Blanche to be Attorney General of the United States, at 14 (July 17, 2026).[1] As explained above, the Attorney General has now also rescinded the May 18 Order in writing. Dkt. 14-8. And even more recently (and post confirmation), in public statements to a group of reporters, the Attorney General stated: "The President said in the cabinet meeting that it's dead. . . . I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House, where I wasn't under oath, where I said it was dead. . . . I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." Fox News, *The DOJ anti-weaponization fund doesn't exist*, at 00:02–44 (Aug. 12, 2026). These assurances are anything but "sparse." Opp. 16.

Plaintiff hypothesizes that the Attorney General issued the Rescission Order to defeat this Court's jurisdiction, and "to obtain support from Senators Cornyn and Tillis for his confirmation," suggesting the Order was a "gambit." Opp. 14–15. But unsupported speculation about the government's motives cannot overcome the legal

[1] Available at https://www.judiciary.senate.gov/imo/media/doc/blanche_-_qfrs.pdf.

consequences of those motives, and the Attorney General has provided sworn testimony under oath that the Fund will not move forward. Rather than undercutting the probative value of the Rescission Order, those circumstances confirm that the answer to the key question—whether "the challenged conduct cannot reasonably be expected to start up again"—is yes. *White*, 227 F.3d at 1243. The Rescission Order includes "language that is 'broad in scope and unequivocal in tone.'" *Rosebrock*, 745 F.3d at 972. Plaintiff also overlooks that when a high-profile dispute is "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and executive," that is reason for the dispute to "not end[] up in court." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (internal quotation marks omitted). Plaintiff's argument is therefore exactly backwards.

Plaintiff relies heavily on the continued existence of the *Trump v. IRS* Settlement Agreement, arguing that it could be "enforce[d]" to bring the Fund back to life. Opp. 14. Again, the Fund never existed, so bringing it "back to life" is a misnomer from the start. But more fundamentally, Plaintiff insinuates—though stops short of saying—that the threat of specific performance of the Settlement Agreement warrants the continued litigation of this action. Perhaps Plaintiff stops short of saying that explicitly because there is a "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract" in "an action against the United States." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68, 971 (D.C. Cir. 1982); *accord Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (explaining that the Tucker Act "'impliedly forbids' declaratory and injunctive relief'" (quoting *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir. 1985))); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (explaining "that the Tucker and Little Tucker Acts impliedly forbid federal courts" from "ordering declaratory or injunctive relief . . . in the form of specific performance"); *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) (same). Plus, if Plaintiff's premise that the Fund is unlawful were correct, specific

performance would not be available for that very reason. *See* 25 Williston on Contracts § 67:3 (4th ed. May 2026 Update) ("If an agreement is illegal or opposed to public policy, specific performance is clearly improper[.]"). In any event, the nature of the contemplated specific performance here would be akin to a writ of mandamus directing the Attorney General to set up a ten-figure settlement claims processing scheme. That would conflict with the vast body of case law suggesting that mandamus of cabinet officials is an extraordinary remedy reserved for the rarest of cases. *E.g.*, *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

There is not going to be a Fund—at all. So, this lawsuit is simply moot.

## II. STANDING AND RIPENESS ARE BOTH LACKING.

Just this week, the Supreme Court stayed a federal district court's injunction on the grounds that the government was likely to succeed on its arguments that the district court lacked jurisdiction because no harm had inured to any plaintiff. *Trump v. California*, 609 U.S. ----, slip op. at 1 (U.S. Aug. 24, 2026). In that decision, the Court reaffirmed several principles compelling the conclusion that Plaintiff here has never had standing and that this case has never been ripe.

The district court in *Trump v. California* had enjoined part of an Executive Order, which "direct[ed] the Secretary of Homeland Security to take appropriate action to create and distribute State Citizenship Lists." *Id.* at 2. But the Supreme Court explained that because that was "an internal directive from the President to a subordinate," *id.*, it itself "imposes no obligations on the States, so they 'suffer no concrete harm from' it," *id.* at 4, and "without concrete harm, there is no standing." *Id.* Furthermore, the Secretary's "eventual action w[ould] reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 133 (2020)). "To see why" there was no Article III standing or ripeness, the Court explained "the unduly long 'chain of inferences' necessary to support the States' supposedly concrete injury;" the "District Court first had to speculate about whether it would be 'feasible' for the Secretary to create and transmit the Lists

before the midterms," "then had to guess how the Secretary might tailor his implementation to be 'consistent with applicable law,' then "had to predict what 'action' the Secretary would deem 'appropriate' for implementing" the Order. *Id.* "After all that, the court still had to estimate whether those actions would be taken 'in a manner substantially likely to harm' the States." *Id.* at 4–5 (citations and quotation marks omitted). But as the Supreme Court concluded, "Article III demands more certainty." *Id.* at 5.

Those considerations compel dismissal here on standing and ripeness grounds. Recall that Plaintiff defines the "Fund Rules" as a combination of (1) the Attorney General's (now-rescinded) May 18 Order and (2) a Department of Justice press release summarizing provisions relating to the Fund in the *Trump v. IRS* Settlement Agreement. Opp. 4. Like the internal directive in the Executive Order at issue in *Trump v. California*, the May 18 Order was an internal directive which did not itself affect anyone's rights and was contingent on the future actions of unnamed Members.

An "unduly long chain of inferences" is also present here. Plaintiff hypothesizes that her claim—had she pursued one—might still have been pending in December 2028; that she would have had to "compete for a portion of the Fund corpus with ineligible claimants," and that if the Fund were held to be "legally infirm, any payment [she] received could be subject to clawback." Opp. 9–10. Thus, like the plaintiffs in *Trump v. California*, entertaining the Plaintiff's claim here would require this Court to guess how the Fund might have tailored its implementation. 609 U.S., slip op. at 4.

To get around these obvious flaws, Plaintiff appeals to the supposedly relaxed standard governing the evaluation of Article III standing in claims based on "procedural injury." Opp. 8–11. But the cases she relies on—including *Sterling v. Feek*, 150 F.4th 1235 (9th Cir. 2025), and *Ctr. for Biological Diversity v. EPA*, 168 F.4th 1164 (9th Cir. 2026)—are inapposite. Those cases arise in situations where a plaintiff has, in fact, "been accorded a procedural right" by applicable law. *See Sterling*, 150 F.4th at 1246 (plaintiff had been accorded a procedural right under 42 U.S.C. § 503); *CBD*, 168 F.4th

at 1174 (plaintiff had a procedural right under ESA § 7). Here, in her attempt to establish standing, Plaintiff simply assumes that the APA's notice-and-comment requirement applies. Opp. 9 ("Defendants injured her by unlawfully depriving her of her right to notice and an opportunity to comment."). As explained below, it does not. Regardless, procedural-injury plaintiffs must assert "some 'concrete interest'" which would be harmed by the inability to comment on a government proposal. *CBD*, 168 F.4th at 1174. And given that this preliminary step never even materialized into a concrete proposal, and is now not happening at all, Plaintiff's allegations run head-first into the Supreme Court's decision in *Trump v. California*.

## III. NOTICE AND COMMENT RULEMAKING DOES NOT APPLY.

The APA does not apply to the actions Plaintiff has challenged in this case. For the reasons explained in Defendants' Motion, Plaintiff does not challenge final agency action. But notice-and-comment procedures would not have applied here if there had been final agency action.[2]

*First*. There is no "final agency action" for the Court to review. Contrary to the Plaintiff's argument that she meets both prongs of the test set forth by the Supreme Court in *Bennett v. Spear*, 520 U.S. 154 (1997), she meets neither. Opp. 16. The signing of an Order to start a process, which set forth time frames and actions to be completed in the future can, in no way, be considered the "consummation" of anything. *Bennett*, 520 U.S. at 178. It marks the initiation, conception, or beginning of a process, not the end or conclusion. And in fact, the Fund would have been "tentative" and "interlocutory" in naturae in that it would have had an express end date. *Id.* As to the second prong, no "legal consequences [ ] flow" from the May 18 Order. Really the only time a legal consequence could have flowed from the Fund is if an applicant accepted

[2] Contrary to Plaintiff's characterization, Opp. 21–22, the Government argued that the Complaint failed to state facts to support the claim that rulemaking was required and reserved its right to respond to any arguments Plaintiff might make in its memorandum regarding APA notice-and-comment procedures. *See* Mot. 19 n.4.

funding in exchange for settling identified claims of weaponized government against them. Prior to that the entire process would have been voluntary. No one would have been forced to forego an otherwise valid claim or abandon any legal form of relief in order to participate in the Fund. In looking at the "effect on the day-to-day operations of the subject party" there can be no serious argument the existence of the Fund—had it existed—would have required any party to change their behavior. The Fund simply would have given victims with at least one valid claim of Weaponization a place to receive compensation and redress for that. This point alone is dispositive of the claim.

*Second*. Notice-and-comment rulemaking is required only for legislative rules. As Plaintiff recognizes, "whether an agency has issued a legislative rule" is determined by "the contents of the agency's action," rather than any "self-serving label." Opp. 20 (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019)). And no party may manufacture the applicability or non-applicability of notice-and-comment through the "mislabeling" of agency action *Id.* (quoting *Allina*, 587 U.S. at 575). "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). In contrast, "[a]n agency action that merely explains how . . . it will exercise its broad enforcement discretion . . . is a general statement of policy." *Id.* at 252.

Failing to heed these principles, throughout her opposition Plaintiff uses the self-serving label of "Fund Rules" to mischaracterize the contents of the May 18 Order and associated Department of Justice press release. Opp. 4–7, 9, 12, 14, 16, 20. But much like in the final agency action context, what matters is "the actual legal effect (or lack thereof) . . . on regulated entities." *McCarthy*, 758 F.3d at 252. The D.C. Circuit has also explained that "the agency's characterization of" the action in question is a key factor courts should use to determine "what makes something a legislative rule." *McCarthy*, 758 F.3d at 251–52. These considerations—which Plaintiff ignores in her

opposition to the Government's Motion—confirm that the challenged actions do not constitute a legislative rule.

Here, there are no regulated entities at all. In fact, the *Trump v. IRS* Settlement Agreement makes explicit that participation in the Fund would have been "voluntary" and would not have "preclude[d] a claimant from seeking judicial or other relief outside The Anti-Weaponization Fund process." Dkt. 13-1, Settlement Agreement at 4.

Furthermore, while the Settlement Agreement provided that "The Anti-Weaponization Fund [would have had] the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," *id.* at 2, the May 18 Order did nothing on that topic. *See McCarthy*, 758 F.3d at 252–53 (explaining that a "Final Notice" issued by the EPA was not final agency action *or* a legislative rule where "the document [was] devoid of *relevant* commands," notwithstanding the fact that the document "signal[ed] likely future permit denials by EPA" (emphasis added)); *see also id.* ("[I]f so, those permit denials can be challenged at that time."). No legal consequences with any bearing on Plaintiff flowed from the challenged documents.

*Gill v. United States Department of Justice*, 913 F.3d 1179 (9th Cir. 2019), is instructive. There, the federal government "sought to standardize the sharing of terrorism-related information through the adoption of a 'Functional Standard'" of suspicious activity potentially suggesting terrorism. *Id.* at 1182–83. The Ninth Circuit concluded that the decision to establish a new "Functional Standard" was "exempt from the notice and comment requirement" because while the Standard "aid[ed] agencies in determining whether an individual is engaged in suspicious activity, . . . the final decision to disseminate a [Suspicious Activity Report] rest[ed] in the analyst's discretion." *Id.* at 1187. In other words, "[t]he significant discretion retained by agencies and their analysts in determining whether to disseminate information compel[led the] decision that the Functional Standard is not a legislative rule." *Id.*

The Ninth Circuit relied on the Fifth Circuit's similarly instructive decision in *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995).

In *Shalala*, the FDA promulgated a policy setting forth nine factors to help the agency determine whether to initiate an enforcement action against a pharmacy engaged in drug manufacturing. 56 F.3d at 593. The court concluded that the policy did not require notice-and-comment before it was promulgated, because the policy left relevant agency decisionmakers considerable discretion, "based on their own judgment," to "decide whether the pharmacy in question" would have been subject to the enforcement policy. *Id.* at 601.

Here, Plaintiff's own Opposition characterizes the May 18 Order as a "foundational decision[] about the establishment, operation, and duration" of a claims adjudication process, Opp. 21, much like the policies held not to be legislative rules in *Gill* and *Customized Care*. And like the foundational policies in those cases, the Fund's commissioners—who, to be clear, were never appointed—would have exercised considerable discretion, guided by the broad factors listed in the *Trump v. IRS* Settlement Agreement. That none of those potentialities ever ended up occurring just confirms that dismissal is proper.

**CONCLUSION**

For the foregoing reasons, as well as those enumerated in Defendants' Motion, the Court should dismiss the Complaint with prejudice.

Dated: August 28, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/ ANDREW J. BLOCK*
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
Henrique Carneiro
*Counsel to the Associate Attorney General*
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*