Stanley E. Woodward, Jr.
ASSOCIATE ATTORNEY GENERAL

Andrew J. Block
Senior Counsel, Office of the Associate Attorney General
Henrique Carneiro
Counsel, Office of the Associate Attorney General
Olivia Mello
Counsel, Office of the Associate Attorney General
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Tel: (202) 514-0136
andrew.block@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALLISON M. GILL,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Case No.: 3:26-cv-3283-CAB-DDL<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 25, 2026<br><br>Time: PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT<br><br>Judge: THE HONORABLE CATHY ANN BENCIVENGO |

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 7

I. THE COURT DOES NOT HAVE ARTICLE III JURISDICTION. ........ 8

A. Standing and Ripeness Are Lacking. ........ 8

B. Plaintiff's Undeveloped Ripeness Arguments Are Unpersuasive. ........ 13

C. The Case is Moot. ........ 14

II. NOTICE AND COMMENT RULEMAKING DOES NOT APPLY. ........ 17

A. There Is No Final Agency Action For the Court to Review. ........ 17

B. Notice and Comment Would Not Have Applied In Any Event. ........ 19

III. GILL IS NOT ENTITLED TO HER REQUESTED RELIEF. ........ 22

A. Declaratory Relief Is Improper. ........ 22

B. Injunctive Relief Is Improper. ........ 23

CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967)....................13

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....................19

*Benhoff v. United States Dept of Justice*,
No. 16-cv-1095-GPC (JLB), 2017 WL 840879 (S.D. Cal. Mar. 3, 2017)....................7

*Bennett v. Spear*,
520 U.S. 154 (1997)....................17

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009)....................18

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026)....................19

*Chapman v. Deutsche Bank Nat'l Trust Co.*,
651 F.3d 1039 (9th Cir, 2011)....................8

*Citizens for Responsibility and Ethics in Washington v. Dep't of Justice*,
No. 1:26-cv-1789 (D.D.C.)....................6

*Colwell v. HHS*,
558 F.3d 1112 (9th Cir. 2009)....................13

*Conservation Cong. v. U.S. Forest Serv.*,
2018 WL 5629335 (E.D. Cal. Oct. 30, 2018)....................22

*CREW v. DOJ*,
2026 WL 1802997 (D.D.C. June 23, 2026)....................15

*Cruz v. Bondi*,
146 F.4th 730 (9th Cir. 2025)....................14

*Cruz v. Bondi*,
2026 WL 50749 (S.D. Cal. Jan. 7, 2026)....................22, 23

*Ctr. for Biological Diversity v. EPA*,
168 F.4th 1164 (9th Cir. 2026)....................12

*Ctr. for Biological Diversity v. Lohn*,
511 F.3d 960 (9th Cir. 2007) ........ 22

*Delaware Valley Regional Center LLC v. Department of Homeland Security*,
106 F.4th 1195 (D.C. Cir. 2024) ........ 18

*Demarest v. United States*,
718 F.2d 964 (9th Cir. 1983) ........ 8

*Emove, Inc. v. Hire a Helper LLC*,
2017 WL 6541249 (S.D. Cal. Dec. 20, 2017) ........ 22

*FBI v. Fikre*,
601 U.S. 234 (2024) ........ 14

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 12

*Floyd v. Dep't of Justice*,
1:26-cv-1399 (E.D. Va.) ........ 6

*Garcia v. Vilsack*,
No. 00-2445 (D.D.C.) ........ 4

*Gill v. DOJ*,
246 F. Supp. 3d 1264 (N.D. Cal. 2017) ........ 8

*Gill v. United States Department of Justice*,
913 F.3d 1179 (9th Cir. 2019) ........ 21

*Griffin v. IRS*,
1:22-cv-24023 (S.D. Fla.) ........ 2

*Habeas Corpus Resource Center v. DOJ*,
816 F.3d 1241 (9th Cir. 2016) ........ 20

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ........ 1

*In re Musk*,
169 F.4th 445 (4th Cir. 2026) ........ 17

*Kanemoto v. Reno*,
41 F.3d 641 (Fed. Cir. 1994) ........ 16

*Keepseagle v. Vilsack*,
102 F. Supp. 3d 306 (D.D.C. 2015) .......... 4, 6

*L1 Technologies, Inc. v. U.S. Customs and Border Protection*,
2020 WL 1701691 (S.D. Cal. 2020) .......... 8

*Love v. Vilsack*,
No. 00-02502 (D.D.C.) .......... 4

*MacKay v. Pfeil*,
827 F.2d 540 (9th Cir. 1987) .......... 8

*Margolin v. Nat'l Ass'n of Immigration Judges*,
146 S. Ct. 1285 (2026) .......... 1

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 16

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) .......... 19, 20, 21

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .......... 13

*Nat'l Park Serv. v. Nat'l Trust for Historic Preservation in the United States*,
609 U.S. ---- (2026) .......... 12

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
590 U.S. 336 (2020) .......... 1

*North Side Lumber Co. v. Block*,
753 F.2d 1482 (9th Cir. 1985) .......... 16

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985) .......... 7

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*,
676 F.3d 829 (9th Cir. 2012) .......... 13, 14

*Orff v. United States*,
358 F.3d 1137 (9th Cir. 2004) .......... 8

*Professionals and Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995) .......... 21

*Robbins v. U.S. Bureau of Land Mgmt.*,
438 F.3d 1074 (10th Cir. 2006) .......... 16

*Rosebrock v. Mathis*,
745 F.3d 963 (9th Cir. 2014) .......... 14, 15, 16

*Ry. Mail Ass'n v. Corsi*,
326 U.S. 88 (1945) .......... 13

*SLPR, LLC v. U.S. Army Corps of Engineers*,
No. 6-cv-1327-MMA (POR), 2011 WL 940509 n.2 (S.D. Cal. Mar. 17, 2011) .......... 7

*Stanley v. Univ. of So. Calif.*,
13 F.3d 1313 (9th Cir. 1994) .......... 23

*Sterling v. Feek*,
150 F.4th 1235 (9th Cir. 2025) .......... 12

*Stuttering Found. of Am. v. Springer*,
498 F. Supp. 2d 203 (D.D.C. 2007) .......... 8

*Texas v. United States*,
523 U.S. 296 (1998) .......... 13

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2000) .......... 13

*Toilet Goods Ass'n, Inc. v. Gardner*,
387 U.S. 158 (1967) .......... 13

*Trump v. California*,
606 U.S. ----, 2026 WL 2473573 (2026) .......... 8–13

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .......... 16

*Trump v. New York*,
592 U.S. 125 (2020) .......... 9

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) .......... 16

*Twenty-Nine Palms Band of Mission Indians v. Garland*,
5:24-cv-00379-SSS-SPx, 2025 WL 882290 (C.D. Cal. Feb. 27, 2025) .......... 7

*United States v. Littlejohn*,
1:23-cr-343 (D.D.C. Jan. 31, 2024) .......... 2

*United States v. Washington*,
653 F.3d 1057 (9th Cir. 2011) .......... 8

*Warren v. Wells Fargo & Co.*,
2017 WL 4541730 (S.D. Cal. Oct. 11, 2017) .......... 23

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 23

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .......... 14, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 22

*Zaitsev v. Warden*,
2026 WL 1850079 (C.D. Cal. May 8, 2026) .......... 22

**Statutes**

5 U.S.C. § 552a(e)(10) .......... 2

5 U.S.C. § 552a(g)(1) .......... 2

15 U.S.C. § 1522 .......... 5

26 U.S.C. § 7431(a)(1) .......... 2

43 U.S.C. § 1473 .......... 5

43 U.S.C. § 1737(c) .......... 5

**Other Authorities**

25 Williston on Contracts § 67:3 (4th ed. May 2026 Update) .......... 16

# OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Gill's motion for summary judgment should be denied. To address the merits of her claims, this Court would have to overlook serious logical gaps in her arguments that this case is justiciable. And as an independent matter, the APA does not permit plaintiffs to obtain an advisory ruling based on injuries that never existed, based on agency actions that have not taken place, or where the likelihood of recurrence of any speculative harm is zero.

This dispute concerns an Anti-Weaponization Fund that has not been set up and is not going forward. Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigration Judges*, 146 S. Ct. 1285, 1288 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here.

Because Plaintiff cannot establish a justiciable APA claim, or demonstrate that the challenged agency action was subject to the procedural requirements she alleges exist here, she is not entitled to judgment as a matter of law. Nor is she entitled to the declaratory and injunctive relief she seeks.

## BACKGROUND

Prior to the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. He succeeded, leaking President Trump's tax return (as well as Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC's tax data) to the New York Times in 2019. The outlet began publishing stories based on the leak starting in September 2020. Littlejohn separately stole thousands of other wealthy individuals' tax data and shared that information with another media company. That was a felony, and Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C. Jan. 31, 2024).

The federal tax code also provides a civil cause of action for damages against the United States for taxpayers whose returns have been leaked. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1). In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim, *see Griffin*, Dkt. 108 at 4–7, ultimately leading to a settlement between Griffin and the United States for a formal apology.[1]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC filed a complaint against the Internal Revenue Service in the

---

[1] *The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

U.S. District Court for the Southern District of Florida asserting claims under these and similar laws, and they contemplated a potential class claim on behalf of similarly situated individuals. *See* Complaint at 1, *Trump v. IRS*, 1:26-cv-20609-KMW, Dkt. No. 1 (Jan. 29, 2026); *see also* Dkt. 13-1 at 1 ("Settlement Agreement").[2] President Trump had also submitted Federal Tort Claims Act ("FTCA") administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims for no "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. *Id.* Instead, President Trump and his family would "receive a formal apology." *Id.* at 1–2. The United States also agreed to release the plaintiffs in that Florida suit from "all claims, charges, counterclaims, causes of action, appeals, or requests for any relief," including for "tax payments" or "debt relief"—if any such proceeding were to "arise out of" the events forming the basis for the Florida suit. *Id.* at 2. And finally, the United States agreed to establish "a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

Per the Settlement, the Attorney General would issue an Order establishing the Fund, its rules, conditions, terms, and "appointing [its] Members." *Id.* Once appointed, Members would have had "the power to determine [the Fund's] own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* They would also have had "the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies."

[2] Unless otherwise noted, "Dkt. ##" refers to docket entries in this case.

*Id.* at 2–3. The Settlement Agreement and corresponding Order garnered significant attention and provoked widespread debate about the weaponization of government, about how any claims process should function and/or whether there should be one at all, and about settlements reached by other administrations.[3]

The Settlement Agreement states that the Attorney General, within 30 days of the its effective date, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." *Id.* "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while "taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

---

[3] For example, the *Keepseagle* settlement "created a Compensation Fund … of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama Administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "To be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." Settlement Agreement at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.
> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4.

The Settlement Agreement contains a rule of construction stating that "Nothing contained in this Settlement Agreement shall impose on Defendants . . . any duty,

obligation, or requirement, the performance of which would be inconsistent with federal statutes." *Id.* at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. Dkt. 13-2 ("Now-Rescinded Fund Order"). The Now-Rescinded Fund Order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also clarified that Fund Members would serve on a volunteer basis. *Id.* And it noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).

Following this announcement, however, the political process continued to unfold. In the ensuing weeks, the Department, through its official pages, in its court filings, in its representations to courts, and through the testimony of the then-Acting Attorney General before a Committee of the House of Representatives stated that "we are not moving forward with the fund, period." House Hearing, at 40:30–42:50. Relying on these statements, a federal court in the District of Columbia denied a motion for a Temporary Restraining Order and Preliminary Injunction in a case very similar to the instant action. *Citizens for Responsibility and Ethics in Washington v. Dep't of Justice*, Case No. 1:26-cv-1789 (D.D.C.) (Leon, J.) (Minute Entry of June 10, 2026, denying motion for Temporary Restraining Order and ECF No.s 20, 21 Order and Memorandum Opinion denying a motion for Preliminary Injunction for lack of subject matter jurisdiction). Meanwhile a court in the Eastern District of Virginia entered a Preliminary Injunction enjoining Defendants, *inter alia*, "from taking any action to create or operate the Anti-Weaponization Fund." *Floyd v. Dep't of Justice*, 1:26-cv-1399, ECF No. 85 (E.D. Va., Jun. 12, 2026).

Thereafter, the then-Acting Attorney General testified, under oath, to the Senate Judiciary Committee, in his confirmation hearing to be Attorney General of the United

States of America that "there is no weaponization fund. The weaponization fund is dead, it's not moving forward" and "I'm under oath today, and I've said it's dead repeatedly." Nomination Hearing at 1:26:42–:49; 2:30:44–:53.

After his hearing, the Attorney General also signed a new, superseding Order, rescinding the May 18 Order, rendering it of "no force or effect," and "establish[ing], beyond any reasonable doubt, that there is no Fund." Dkt. 14-8 ("Rescission Order"). And even after being sworn in as the Attorney General, he repeated: "The President said in the cabinet meeting that it's dead … I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House where I wasn't under oath, where I said it was dead … I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." Fox News, *Todd Blanche: The DOJ anti-weaponization fund doesn't exist*, at 00:02–:44 (Aug. 12, 2026).

All to say: when Plaintiff filed this case (and indeed still today), no money had been transferred to the Fund, nor has there been any claimant. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. None of the five contemplated Members who would establish and administer such procedures for the Fund were ever appointed.

## LEGAL STANDARD

"[T]he standard on summary judgment in a standard civil case is different than reviewing an agency decision in an APA case." *Benhoff v. United States Dept of Justice*, No. 16-cv-1095-GPC (JLB), 2017 WL 840879, at *4 (S.D. Cal. Mar. 3, 2017). *See also* SLPR, LLC v. U.S. Army Corps of Engineers, No. 6-cv-1327-MMA (POR), 2011 WL 940509, at *3 n.2 (S.D. Cal. Mar. 17, 2011). "In deciding whether to grant summary judgment in an APA case, the district court 'is not required to resolve any facts.'" *Twenty-Nine Palms Band of Mission Indians v. Garland*, 5:24-cv-00379-SSS-SPx, 2025 WL 882290, at *2 (C.D. Cal. Feb. 27, 2025) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Rather, summary judgment is a "mechanism

for deciding, as a matter of law, whether the agency action" violates the APA. *Gill v. DOJ*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017) (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)). And ultimately, "the APA's legal standard controls." *L1 Technologies, Inc. v. U.S. Customs and Border Protection*, 2020 WL 1701691, at *6 (S.D. Cal. 2020).

But before a court can evaluate the merits of a plaintiff's APA arguments, it must first address whether there is subject-matter jurisdiction. *MacKay v. Pfeil*, 827 F.2d 540, 543 (9th Cir. 1987) ("If a district court grants summary judgment in a case over which it does not have jurisdiction, the court of appeals must vacate the judgment. . ."); *Orff v. United States*, 358 F.3d 1137, 1149–1150 (9th Cir. 2004) (holding that, because the district court lacked jurisdiction "at the outset," the court's "rulings on the merits... were nullities" that the appeals court "must vacate") (citations omitted); *United States v. Washington*, 653 F.3d 1057, 1065 (9th Cir. 2011) (appeals court "must vacate" district court's disposition where entered notwithstanding the absence of jurisdiction); *Demarest v. United States*, 718 F.2d 964, 965 (9th Cir. 1983) ("an appellate court affirming the conclusion that jurisdiction is lacking should vacate the summary judgment and remand for entry of judgment of dismissal"); *Chapman v. Deutsche Bank Nat'l Trust Co.*, 651 F.3d 1039, 1044 (9th Cir, 2011) ("any decision on the merits must be vacated" where it was entered despite lack of jurisdiction).

## I. THE COURT DOES NOT HAVE ARTICLE III JURISDICTION.

### A. Standing and Ripeness Are Lacking.

Gill does not have standing, and this case is not ripe, because none of the challenged agency actions have affected Gill's rights in any way. In *Trump v. California*, the Supreme Court assessed the justiciability of claims brought by a group of state plaintiffs challenging the constitutionality of several provisions in an executive order designed to maintain public confidence in federal elections. 606 U.S. ----, 2026 WL 2473573, at *1 (2026). One challenged provision consisted of a directive from the President to the Secretary of Homeland Security to "take appropriate action to create

and distribute State Citizenship Lists." *Id.* at *2. The Supreme Court explained that, as "an internal directive from the President to a subordinate," the provision "impose[d] no obligations on the States, so they 'suffer no concrete harm from it.'" *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 134 (2020)). The "true source of any injury," the Court explained, "would be the downstream action that the Secretary *might* take in the future to implement" the provision, which in any event could "be implemented only [t]o the extent feasible and consistent with applicable law." *Id.* (citations and quotation marks omitted). This meant that, "to support the States' supposedly concrete injury," a federal court would have to accept an "unduly long chain of inferences" in a manner inconsistent with Article III's limitation on judicial power. *Id.* "The District Court first had to speculate about whether it would be 'feasible' for the Secretary to create and transmit the Lists before the midterms." *Id.* (citation omitted). "Next, the court had to predict what 'action' the Secretary would deem 'appropriate' for implementing" the provision. *Id.* (citation omitted). "After all that, the court still had to estimate whether those actions would be taken in a manner substantially likely to harm the States." *Id.* (citation omitted). The Supreme Court explained that such "stacking" of "hypothetical on hypothetical to speculate that harm will eventually materialize" is "prohibit[ed]" by Article III. *Id.*

Another provision, which the Supreme Court also held the States lacked standing to challenge, "direct[ed] the Postal Service to issue a notice of proposed rulemaking." *Id.* at *4. The provision "order[ed] the Postal Service to initiate the process of proposing a rule that might bind the States in the future." *Id.* It was not itself "a proposed rule, let alone a final rule," and "impose[d] no legal requirements . . . on anyone outside the Executive Branch." *Id.* Like the challenge to the citizenship list provision, here the District Court would have to engage in an impermissible "string of speculations to find this suit justiciable," first speculating "about whether the Postal Service would propose a rule," then speculating "about how the agency would weigh the comments it received," then speculating about "whether the agency would issue a final rule," then

speculating "about what the final rule would say," and "[f]inally, after all that, . . . speculat[ing] about whether the text of a hypothetical final rule would harm the States." *Id.* Because of the elaborate chain of inferences necessary to support any claim of injury based on either of these provisions, the Court concluded Article III jurisdiction was lacking under both the standing and ripeness doctrines. *Id.* at *2.

Similarly here, Plaintiff asks this Court to recognize Article III injury based on predictions about how the Fund would have operated, even though the Fund has never even existed, none of its Members have ever been appointed, and no comprehensive procedures governing claims processing have ever been established. "Article III demands more certainty." *Id.*

Gill challenges the Settlement Agreement and "two items [released] on May 18" that purportedly "carry out the terms" of that agreement: the Now-Rescinded Fund Order, which initiated the process of establishing the Fund, and a "website notice" Gill characterizes as "[m]imicking the terms of the settlement agreement," Dkt. 14-4 ("Website Notice"). Dkt. 14 at 4 ("SJ Mot."). Gill contends that, put together, these documents constitute so-called "Fund Rules." SJ Mot. 5, 7, 9–10, 13, 15–18, 21–22. But that is a misnomer, as those documents describe a government program that would exist and operate only at some unidentified later date.

***The Settlement Agreement.*** The Settlement Agreement put in writing a proposed Fund that would exist in the future, not an actual government program capable of affecting anyone's rights. While it contemplated the creation of "The Anti-Weaponization Fund," that was "subject to the terms and limitations described" in the remainder of the Agreement as well as future implementing actions. Settlement Agreement at 2. First, "within 30 days of the Effective Date," the Attorney General would issue "[a]n accompanying order" which would "establish funding and any other relevant requirements, rules, conditions, terms, and waivers." *Id.* Second, "[w]ithin 30 days of the Effective Date, the Attorney General" would "issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund," with one member

"chosen in consultation with congressional leadership." *Id.* Third, there would be no quorum without at least three Members. *Id.* Fourth, the Fund's Members would have had "the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," including but not limited to "reasonable steps to protect private personal and financial information" and "controls and systems to avoid fraudulent claims." *Id.* at 2–4. The planned Fund was also designed to operate "consistent with law," with "the validity of [remaining] provisions . . . not . . . impaired" if any provision were "found by a court to be invalid or unenforceable." *Id.* at 4–5.

***The Now-Rescinded Fund Order and Website Notice.*** On the same day the Settlement Agreement was signed, the Attorney General issued the Now-Rescinded Fund Order allowing the process of establishing the Fund to begin, but the Now-Rescinded Fund Order did not establish any "rules, conditions, terms, [or] waivers," and it did not appoint any Members, much less a Chair. Gill repeatedly refers to the "Fund Rules" as a proper noun, but that that phrase is used nowhere in the settlement agreement or in the Department of Justice announcements. No such "Fund Rules" exist. Further, what she cites as the "rules" is her characterization and summation, without any directly quoted language.

The Website Notice referred to the Fund as an entity that would come into being at some point in the future, saying it "*will consist* of five members appointed by the Attorney General (AG)," with one member who "*will be chosen* in consultation with Congressional leadership," with funding that "*will come* from the judgment fund." Dkt. 14-4 (emphases added).

Under a straightforward application of the Supreme Court's decision in *Trump v. California*, these documents do not affect any Gill's rights, and thus cannot form the basis for Article III standing, and for the same reasons, they do not establish a case ripe for adjudication. 2026 WL 2473573, at *2. Like the internal directives in the Executive Order at issue in *Trump v. California*, the Now-Rescinded Fund Order was an internal directive which did not itself affect anyone's rights and was contingent on the future

actions of unnamed Members. An "unduly long chain of inferences" is also present here. Plaintiff hypothesizes that her claim—had she pursued one—might still have been pending in December 2028; that she would have had to "compete for a portion of the Fund corpus with ineligible claimants," and that if the Fund were held to be "legally infirm, any payment [she] received could be subject to clawback." SJ Mot. 10. Thus, like the plaintiffs in *Trump v. California*, entertaining the Plaintiff's claim here would require this Court to guess how the Fund might have tailored its implementation and how five unnamed members would have administered the Fund to an unknown number of claimants presenting unknown fact patterns. 2026 WL 2473573, at *4.

Providing even further guidance, the Supreme Court further held that "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *Nat'l Park Serv. v. Nat'l Trust for Historic Preservation in the United States*, 609 U.S. ----, 2026 WL 2564318, at *2 (2026) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024)). That applies squarely to Gill here; she has no interest other than being distressed by a planned (now defunct) policy.

To get around these obvious flaws, Plaintiff appeals to the supposedly relaxed standard governing the evaluation of Article III standing in claims based on "procedural injury." SJ Mot. 9–10. But the cases she relies on—including *Sterling v. Feek*, 150 F.4th 1235 (9th Cir. 2025), and *Ctr. for Biological Diversity v. EPA*, 168 F.4th 1164 (9th Cir. 2026)—are inapposite. Those cases arise in situations where a plaintiff has, in fact, "been accorded a procedural right" by applicable law. *See Sterling*, 150 F.4th at 1246 (plaintiff had been accorded a procedural right under 42 U.S.C. § 503); *CBD*, 168 F.4th at 1174 (plaintiff had a procedural right under ESA § 7). Here, in her attempt to establish standing, Plaintiff simply assumes that the APA's notice-and-comment requirement applies. SJ Mot. 9 ("Defendants injured her by unlawfully depriving her of her right to notice and an opportunity to comment."). As explained below, it does not. Regardless, procedural-injury plaintiffs must assert "some 'concrete interest'" which would be harmed by the inability to comment on a government proposal. *CBD*, 168 F.4th at 1174.

And given that this preliminary step never even materialized into a concrete proposal, and is now not happening at all, Plaintiff's allegations run head-first into the Supreme Court's decision in *Trump v. California*.

**B. Plaintiff's Undeveloped Ripeness Arguments Are Unpersuasive.**

"Ripeness is a justiciability doctrine designed to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative polices, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967)). "A claim is not ripe for adjudication if it rests upon contingent future events that may occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). Constitutional ripeness requires an existing "case or controversy" that is "concrete," and "not hypothetical or abstract." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). There must be a "realistic danger of sustaining a direct injury as a result of defendants[]" and it must not be "speculative to support jurisdiction." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).

Gill offers little to explain how her claim is concrete and not hypothetical. *See* SJ Mot. 11–13. In fact, Gill's own motion concedes that mere "'ambiguity' over whether the challenged action is exempt from the notice-and-comment process" undercuts ripeness. Mot. 12 n.5 (citing *Colwell v. HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009)); *see also Colwell*, 558 F.3d at 1128 ("If and when the parties are able to provide examples of the manner in which the HHS has used the Policy Guidance…we will be in a better position to determine whether [it] functions as a substantive rule or as a general statement of policy."). And courts regularly decline to review challenges of recently promulgated laws or regulations to await the actual application of the rule. *See*

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967) ("We believe that judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here.").

**C. The Case is Moot.**

Because there is not going to be a Fund, Plaintiff has received all the relief she requested and the case is moot. Plaintiff's own arguments confirm as much. She challenges the Now-Rescinded Fund Order and the Website Notice summarizing the Settlement Agreement. SJ Mot. 3–5. But she concedes that the purported "agency action" no longer exists, SJ Mot. 2, 7, 16, 17, and there can be no reasonable dispute that the Now-Rescinded Fund Order is of "no force or effect," nor can there be any reasonable dispute that the Rescission Order "establishe[d], beyond any reasonable doubt, that there is no Fund." Dkt. 14-8. But in an attempt to avoid the case-ending consequences of these developments, Plaintiff speculates that Defendants' representations, including the Rescission Order, "fall[] short of demonstrating that [they] cannot reasonably be expected to do again in the future what [they are] alleged to have done in the past." SJ Mot. 16 (quoting *FBI v. Fikre*, 601 U.S. 234, 242 (2024)).

First, nothing ever *occurred*, so nothing can be expected to "*recur*." Plaintiff's contention further fails under basic mootness principles articulated by the Ninth Circuit. Addressing policy changes, of the sort at issue here, courts are "more likely" to find mootness where officials "have not engaged in conduct similar to that challenged by plaintiff"; where "the policy change is evidenced by language that is 'broad in scope and unequivocal in tone'"; where it "fully addresses all of the objectionable measures." *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (quoting *White v. Lee*, 227 F.3d 1214, 1222–24 (9th Cir. 2000)). As explained below, each of these factors weigh heavily in favor of finding mootness here.

The Government's representations have been consistent, have all pointed in the same direction, and have been made under the threat of serious penalties and sanctions for falsity. *See Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (explaining that there is a "long-standing presumption of regularity" whereby courts presume officers "properly discharge their official duties"); *Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy."). In light of this overwhelming consistency, Plaintiff's attempt to characterize the Government's representations that the Fund will not go forward as false rings hollow. SJ Mot. 16, 23.

In June, one court found that claims regarding the fund were "likely moot." *CREW v. DOJ*, 2026 WL 1802997, at *1 (D.D.C. June 23, 2026). The Attorney General subsequently testified under oath that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States at 1:26:42–49. He said the same thing in written answers to Senators' Questions for the Record in connection with his Senate confirmation. *See, e.g.*, Questions for the Record, The Nomination of the Honorable Todd Blanche to be Attorney General of the United States, at 14 (July 17, 2026).[4] As explained above, the Attorney General has now also rescinded the May 18 Order in writing. Dkt. 14-8. And even more recently (and post confirmation), in public statements to a group of reporters, the Attorney General stated: "The President said in the cabinet meeting that it's dead. . . . I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House, where I wasn't under oath, where I said it was dead. . . . I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." Fox News, *The DOJ anti-weaponization fund doesn't exist*, at 00:02–44 (Aug. 12, 2026). These assurances are anything but "sparse." SJ Mot. 16.

[4] Available at https://www.judiciary.senate.gov/imo/media/doc/blanche_-_qfrs.pdf.

Plaintiff hypothesizes that the Attorney General issued the Rescission Order to defeat this Court's jurisdiction, and "to obtain support from Senators Cornyn and Tillis for his confirmation," suggesting the Order was a "gambit." SJ Mot. 15. But unsupported speculation about the government's motives cannot overcome the legal consequences of those motives, and the Attorney General has provided sworn testimony under oath that the Fund will not move forward. Rather than undercutting the probative value of the Rescission Order, those circumstances confirm that the answer to the key question—whether "the challenged conduct cannot reasonably be expected to start up again"—is yes. *White*, 227 F.3d at 1243. The Rescission Order includes "language that is 'broad in scope and unequivocal in tone.'" *Rosebrock*, 745 F.3d at 972. Plaintiff also overlooks that when a high-profile dispute is "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and executive," that is reason for the dispute to "not end[] up in court." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (internal quotation marks omitted). Plaintiff's argument is therefore exactly backwards.

Plaintiff relies heavily on the continued existence of the *Trump v. IRS* Settlement Agreement, arguing that it could be "enforce[d]" to bring the Fund back to life. SJ Mot. 14. Again, the Fund never existed, so bringing it "back to life" is a misnomer from the start. But more fundamentally, Plaintiff insinuates—though stops short of saying—that the threat of specific performance of the Settlement Agreement warrants the continued litigation of this action. Perhaps Plaintiff stops short of saying that explicitly because there is a "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract" in "an action against the United States." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68, 971 (D.C. Cir. 1982); *accord Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (explaining that the Tucker Act "'impliedly forbids' declaratory and injunctive relief'" (quoting *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir. 1985))); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d

1074, 1082 (10th Cir. 2006) (explaining "that the Tucker and Little Tucker Acts impliedly forbid federal courts" from "ordering declaratory or injunctive relief . . . in the form of specific performance"); *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) (same). Plus, if Plaintiff's premise that the Fund is unlawful were correct, specific performance would not be available for that very reason. *See* 25 Williston on Contracts § 67:3 (4th ed. May 2026 Update) ("If an agreement is illegal or opposed to public policy, specific performance is clearly improper[.]"). In any event, the nature of the contemplated specific performance here would be akin to a writ of mandamus directing the Attorney General to set up a ten-figure settlement claims processing scheme. That would conflict with the vast body of case law suggesting that mandamus of cabinet officials is an extraordinary remedy reserved for the rarest of cases. *E.g.*, *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

There is not going to be a Fund—at all. So, this lawsuit is simply moot.

## II. NOTICE AND COMMENT RULEMAKING DOES NOT APPLY.

Summary Judgment is additionally improper for the simple reason that the APA does not apply to the actions Plaintiff has challenged in this case. First, Plaintiff does not challenge final agency action. And in any event, notice-and-comment procedures would not have applied here even if there had been final agency action.

### A. There Is No Final Agency Action For the Court to Review.

For essentially the same reasons there is no standing or ripeness, there is no "final agency action" for the Court to review, meaning the APA does not apply at all. Contrary to the Plaintiff's argument that she meets both prongs of the test for determining whether something is a final agency action set forth by the Supreme Court in *Bennett v. Spear*, 520 U.S. 154 (1997), she meets neither. SJ Mot. 17. The signing of an Order to start a process, which set forth time frames and actions to be completed in the future can, in no way, be considered the "consummation" of anything. *Bennett*, 520 U.S. at 178. It marks the initiation, conception, or beginning of a process, not the end or conclusion. And in fact, the Fund would have been "tentative" and "interlocutory" in

nature in that it would have had an express end date. *Id.* As to the second prong, no "legal consequences [ ] flow" from the May 18 Order. Really the only time a legal consequence could have flowed from the Fund is if an applicant accepted funding in exchange for settling identified claims of weaponized government against them. Prior to that, the entire process would have been voluntary. Settlement Agreement at 3. No one would have been forced to forego an otherwise valid claim or abandon any legal form of relief in order to participate in the Fund. In looking at the "effect on the day-to-day operations of the subject party," there can be no serious argument the existence of the Fund—had it ever come into existence—would have required any party to change their behavior. The Fund simply would have given victims with at least one valid claim of Weaponization a place to receive compensation and redress for that. This point alone is dispositive of the claim.

The D.C. Circuit has held in analogous situations that challenged agency action was not "final" under the APA. In *Delaware Valley Regional Center LLC v. Department of Homeland Security*, USCIS published statements within the Q&A and Policy Manual to specify that immigrants seeking to demonstrate their eligibility for infrastructure-project visas must file an application. 106 F.4th 1195, 1205 (D.C. Cir. 2024) ("USCIS stated only that it requires regional centers and visa applicants to submit forms that demonstrate their eligibility for a new benefit. Thus, the statements in the Q&A and the Policy Manual…do not constitute 'final agency action.'") (quoting *Catawba Cnty. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009)). The plaintiffs in *Delaware Valley* sought eligibility for a newly created pool of EB-5 visas for investors. As in this case, the challenged statements in *Delaware Valley Regional Center* were about how the agency explained it would administer the first step of a drawn-out process. There was no definitive eligibility decision. Plaintiffs there attempted to "infer from USCIS's statements in the Q&A and the Policy Manual that the agency ha[d] categorically excluded" them "from consideration," but the D.C. Circuit rejected that argument, explaining that they had "not established that USCIS has adopted that interpretation."

*Id.* at 1205. "[R]ather than anticipate that their applications will be rejected based on an unfavorable interpretation," the prospective applicants had to "file application[s]" first, and they would have had "the opportunity to litigate the issues they raise[d]" at that point. *Id.* at 1206. But before that, there was no final agency action. *Id.* Likewise here, if the Fund had come into existence, Gill would have had the opportunity to seek redress for her injuries after applying and being rejected. Settlement Agreement at 4.

In another analogous decision, the D.C. Circuit held that an MOU between the IRS and DHS "outlining procedures that will govern requests . . . for addresses of persons subject to criminal investigation," was not a reviewable final agency action. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1224, 1235–36 (D.C. Cir. 2026). The D.C. Circuit made clear that finality depends on "the actual legal effect (or lack thereof) of the agency action," as well as the agency's own "characterization of the guidance" and "whether the agency has applied the guidance as if it were binding." *Centro*, 167 F.4th at 1236. The Court explained that IRS "never characterized" the MOU "as a rule," nor did it "rel[y] on the MOU to justify its actions," and the "MOU merely outline[d] the process through which ICE can request addresses from IRS." *Id.* As explained above, the challenged documents—which is the most important place for the Court to look to assess DOJ's characterizations of the Fund—referred to the program as something that would only only exist in the future. And it is beyond reasonable dispute that no government actor "has applied the guidance as if it were binding on regulated parties." *Id.*

**B. Notice and Comment Would Not Have Applied In Any Event.**

Notice-and-comment rulemaking is required only for legislative rules. As Plaintiff recognizes, "whether an agency has issued a legislative rule" is determined by "the contents of the agency's action," rather than any "self-serving label." SJ Mot. 20 (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019)). And no party may manufacture the applicability or non-applicability of notice-and-comment through the "mislabeling" of agency action *Id.* (quoting *Allina*, 587 U.S. at 575). "An agency action

that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). In contrast, "[a]n agency action that merely explains how . . . it will exercise its broad enforcement discretion . . . is a general statement of policy." *Id.* at 252.

Failing to heed these principles, throughout her opposition Plaintiff uses the self-serving label of "Fund Rules" to mischaracterize the contents of the May 18 Order and associated Department of Justice press release.[5] SJ Mot. 5, 7, 9–10, 13, 15–18, 21–22. But much like in the final agency action context, what matters is "the actual legal effect (or lack thereof) . . . on regulated entities." *McCarthy*, 758 F.3d at 252. The D.C. Circuit has also explained that "the agency's characterization of" the action in question is a key factor courts should use to determine "what makes something a legislative rule." *McCarthy*, 758 F.3d at 251–52. These considerations—which Plaintiff ignores in her opposition to the Government's Motion—confirm that the challenged actions do not constitute a legislative rule.

Here, there are no regulated entities at all. In fact, the Settlement Agreement makes explicit that participation in the Fund would have been "voluntary" and would not have "preclude[d] a claimant from seeking judicial or other relief outside The Anti-Weaponization Fund process." Settlement Agreement at 4.

---

[5] *Habeas Corpus Resource Center v. DOJ*, 816 F.3d 1241, 1254 n.17 (9th Cir. 2016) hurts, not helps, Plaintiff. She describes that decision as holding "that the Attorney General's decision not to use notice-and-comment rulemaking presents a 'procedural claim [that] is ripe for review.'" SJ Mot. 12–13 n.5. While the Ninth Circuit explained that may ordinarily be true, it doubted the principle applied in that case; the plaintiffs "essentially complain[ed] that they did not receive notice" in an original Final Rule that future certification decisions would not themselves have been subject to notice-and-comment procedures, but because "the Attorney General ha[d] not yet endeavored to begin" such future certification processes, it was unlikely that Plaintiffs' claims were ripe. *Id.*

Furthermore, while the Settlement Agreement provided that "The Anti-Weaponization Fund [would have had] the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," *id.* at 2, the Now-Rescinded Fund Order did nothing on that topic, nor did the Website Notice, which Gill concedes merely restated the Settlement Agreement. *See McCarthy*, 758 F.3d at 252–53 (explaining that a "Final Notice" issued by the EPA was not final agency action *or* a legislative rule where "the document [was] devoid of *relevant* commands," notwithstanding the fact that the document "signal[ed] likely future permit denials by EPA" (emphasis added)); *see also id.* ("[I]f so, those permit denials can be challenged at that time."). No legal consequences with any bearing on Plaintiff flowed from the challenged documents.

*Gill v. United States Department of Justice*, 913 F.3d 1179 (9th Cir. 2019), is instructive. There, the federal government "sought to standardize the sharing of terrorism-related information through the adoption of a 'Functional Standard'" of suspicious activity potentially suggesting terrorism. *Id.* at 1182–83. The Ninth Circuit concluded that the decision to establish a new "Functional Standard" was "exempt from the notice and comment requirement" because while the Standard "aid[ed] agencies in determining whether an individual is engaged in suspicious activity, . . . the final decision to disseminate a [Suspicious Activity Report] rest[ed] in the analyst's discretion." *Id.* at 1187. In other words, "[t]he significant discretion retained by agencies and their analysts in determining whether to disseminate information compel[led the] decision that the Functional Standard is not a legislative rule." *Id.*

The Ninth Circuit relied on the Fifth Circuit's similarly instructive decision in *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995). In *Shalala*, the FDA promulgated a policy setting forth nine factors to help the agency determine whether to initiate an enforcement action against a pharmacy engaged in drug manufacturing. 56 F.3d at 593. The court concluded that the policy did not require notice-and-comment before it was promulgated, because the policy left relevant agency

decisionmakers considerable discretion, "based on their own judgment," to "decide whether the pharmacy in question" would have been subject to the enforcement policy. *Id.* at 601.

Here, Plaintiff's own Opposition characterizes the May 18 Order as a "foundational decision[] about the establishment, operation, and duration" of a claims adjudication process, SJ Mot. 21, much like the policies held not to be legislative rules in *Gill* and *Customized Care*. And like the foundational policies in those cases, the Fund's commissioners—who, to be clear, were never appointed—would have exercised considerable discretion, guided by the broad factors listed in the *Trump v. IRS* Settlement Agreement. That none of those potentialities ever ended up occurring just confirms that dismissal is proper.

**III. GILL IS NOT ENTITLED TO HER REQUESTED RELIEF.**

Gill's request that the Court "ensure that Defendants do not re-establish the Fund without notice-and-comment rulemaking" should be rejected because such relief would violate the doctrines of standing, ripeness, and mootness, and would therefore amount to a request for an advisory opinion.

**A. Declaratory Relief Is Improper.**

"The test for determining whether a claim for declaratory relief is moot is whether there is 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Zaitsev v. Warden*, 2026 WL 1850079, at *4 (C.D. Cal. May 8, 2026) (quoting *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007). Further, "[a]djudicating rights and obligations in the absence of a live 'case or controversy' would violate the Article III limitation against advisory opinions." *Emove, Inc. v. Hire a Helper LLC*, 2017 WL 6541249, at *3 (S.D. Cal. Dec. 20, 2017). For reasons described earlier in this opposition, there is no sufficient immediacy or live 'case or controversy.'

**B. Injunctive Relief Is Improper**.

As this Court has noted, injunctive relief "is an extraordinary remedy never awarded as of right." *Cruz v. Bondi*, 2026 WL 50749, at *1 (S.D. Cal. Jan. 7, 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant is entitled to injunctive relief only if it demonstrates that a substantial and irreparable harm is likely to occur in its absence. *Conservation Cong. v. U.S. Forest Serv.*, 2018 WL 5629335, at *4 (E.D. Cal. Oct. 30, 2018). Plaintiff has not met the burden of showing "irreparable injury and the inadequacy of legal remedies." *Warren v. Wells Fargo & Co*., 2017 WL 4541730, at *3 (S.D. Cal. Oct. 11, 2017) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *Stanley v. Univ. of So. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994). There is no evidence that the DOJ intends to reestablish the Fund—there is only evidence to the contrary. There is no immediate irreparable, threatened harm, only a hypothetical one that cannot reasonably be expected to occur. Plaintiff has not proved that there will be irreparable injury to not obtain the opportunity to comment on a hypothetical implementation of a fund that never existed in the first place.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and dismiss the case with prejudice.

Dated: September 11, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/ ANDREW J. BLOCK*
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
Henrique Carneiro
*Counsel to the Associate Attorney General*
Olivia Mello
*Counsel to the Associate Attorney General*
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*